[Cite as *Didonato v. Stewart*, 2015-Ohio-270.]

COURT OF APPEALS
TUSCARAWAS COUNTY, OHIO
FIFTH APPELLATE DISTRICT

CHRISTINA DIDONATO

      Respondent-Appellant

-vs-

CHRISTINE STEWART

      Petitioner-Appellee

JUDGES:
Hon. William B. Hoffman, P.J.
Hon. W. Scott Gwin, J.
Hon. John W. Wise, J.

Case No. 2014AP050020

O P I N I O N

CHARACTER OF PROCEEDING:     Appeal from the Tuscarawas County Court of Common Pleas, Case No. 2014PO040243

JUDGMENT:     Affirmed

DATE OF JUDGMENT ENTRY:     January 20, 2015

APPEARANCES:

For Respondent-Appellant

MICHELA HUTH
257 Canal Street
PO Box 673
Bolivar, Ohio 44612

For Petitioner-Appellee

PAUL HERVEY
Fitzpatrick, Zimmerman & Rose Co., L.P.A.
P.O. Box 1014
New Philadelphia, Ohio 44663

*Hoffman, P.J.*

{¶1}    Respondent-appellant Christina DiDonato appeals the May 1, 2014 Order entered by the Tuscarawas County Court of Common Pleas granting a petition for a civil stalking protection order in favor of Petitioner-appellee Christine Stewart.

STATEMENT OF THE CASE AND FACTS

{¶2}    Petitioner-appellee Christine Stewart filed a petition for a civil stalking protection order on April 21, 2014 in the Tuscarawas County Court of Common Pleas against Respondent-appellant Christina DiDonato.   The trial court conducted a hearing on the motion on April 29, 2014.    On May 1, 2014, the court granted a full order of protection in favor of Appellee Stewart against Appellant DiDonato for herself and her two children for a period of one year, until April 30, 2015.

{¶3}    At the hearing, witness testimony established Appellant was recently divorced, and was the mother of two children.  Appellee, the girlfriend of Appellant's ex-husband, had been the babysitter of Appellant's children.   The trial court found Appellant verbally assaulted Appellee several times, and had engaged in a pattern of conduct causing Appellee to believe Appellant would cause her physical harm or cause or has caused her mental distress and the Order was equitable, fair and necessary to protect Appellee and her children.

{¶4}    Appellant appeals the granting of the civil stalking protection order, assigning as error:

{¶5}    "I. THE COURT OF COMMON PLEAS ERRED AND ABUSED ITS DISCRETION WHEN IT FOUND 'RESPONDENT VERBALLY ASSAULTED

PETITIONER SEVERAL TIMES. RESPONDENT'S WITNESS CONTRADICTED RESPONDENT'S TESTIMONY. RESPONDENT'S CREDIBILITY IS MINIMAL.' "

I.

{¶6} The trial court's May 1, 2014 Order makes the following finding of fact,

{¶7} "Respondent verbally assaulted Petitioner several times. Respondent's witness contradicted Respondent's testimony. Respondent's credibility is minimal."

{¶8} Appellant maintains the trial court erred in finding Bryon Holbrook's testimony contradicted Appellant's own testimony.

{¶9} At the hearing herein, Appellant testified,

Q. Any concerns with Miss Stewart watching your boys?

A. Do I have concerns with Miss Stewart?

Q. Did you?

A. Not then. Now I do, yes.

Q. Why do you have concerns now?

A. Why do I have concerns that Miss Stewart is, is caring for my children? Because she's irrational, she grabbed the phone from my son while I was speaking with my son, she yelled at me, by phone, twice in the presence of my children, she then supplied cell phones to my children without my permission and no nine year old and six year old should be having any personal phone, and she transported my child to track practice and did not supply any liquid for him during his hour of practice, during an eighty degree day.

Q. Any other concerns we need to know about?

A. She's, you know, she's an irrational, unfit caregiver.

Q. And the basis, I've listed six concerns here, and your basis for all these concerns about Miss Stewart come from interactions you've had with her in the month of April, Two Thousand Fourteen?

A. The interaction I had with her last Friday.

Q. Ma'am, please let me finish the question.  Your attorney will get to ask you questions if he wants.  All of your concerns about Miss Stewart, all of them come up from April Two Thousand Four (sic), these aren't concerns you have about her twenty years ago, two years ago or two months ago?

A. These concerns came up from last Friday, Good Friday.

Q. All from Good Friday?

A. And Saturday, yes, yes.

* * *

Q. Thank you.  Okay, do you yell at my client in front of your children?

A. Do I -

Q. Did you -

A. Did -

Q. - at the track practice that Saturday yell at my client?

A. No, sir.

Q. Do you yell at her in front of any other adults or children?

A. No, sir.

Q. Okay, did you demand to know where the water was for your children?

A. I asked my son, Peter, if he had liquids, yes, if he had something to drink and he told me no.

Q. And then you did what?

A. Then I gave him my Gatorade.

Q. Okay, you never talked to my client?

A. No, sir.

Q. Okay, did you, let's see, how many times do you believe that Miss Stewart has babysat your children?

A. Too many.

Q. Other than the obvious sarcasm, how many is too many?

A. Too many.

Q. More than ten times?

A. Couple times, maybe.

Q. A couple times?

A. Um hum.

Q. Okay, well let's back up, because you said all of these concerns were from the two days before Easter. You believe that my client grabbed a phone from your son?

A. She did, sir, yes.

Q. Were you there to see it?

A. My son told me she did grab -

Q. No, no, no. Were you there to see it?

A. I was not witness, no, because I don't live in their home and I was not in her home, but she did grab -

Q. And that's a no, you didn't see it, correct?

A. Correct.

Q. Okay, did you ever yell at my client on the phone?

A. No.

Q. Okay, and did you - did my client, Miss Stewart, tell you to stop calling her personal cell phone?

A. Yes, she did. I think, in fact, she blocked me from her phone.

***

Q. So let me help understand that. You told Mr. DiDonato that he couldn't have the children over Thursday night if he could not get -

A. No.

Q. Ma'am, that's the third time you've interrupted me. You've been in court before. I'm going to ask you to wait until I ask the question and I'm going to wait till you give the answer.

A. Sorry, I thought you had finished, okay.

Q. You told Mr. DiDonato he couldn't have the children over Thursday night unless he would get this child to a Friday morning medical appointment, correct?

A. No.

Q. Okay, so other than the track meet did you see Miss Stewart, or track practice, did you see Miss Stewart with the children anywhere else?

A. Yes, at Burger King.

Q. Okay, when was that?

A. I didn't, I'm sorry, I didn't. I didn't visually see, see Miss Stewart but I was at Burger King.

Q. And where was she?

A. I don't know.

Q. Did you text her to tell her to hold your child's hand as she crossed the parking lot?

A. I texted both Mr. DiDonato and Miss Stewart. I have no idea, it was probably either Friday or Saturday. My son has some concerns with attention issues and his safely is a big concern to me, as it would be to anybody that is responsible for watching my children and yes, it's very important, because of my son's attention issues, that whoever is with my son in parking lots, in areas where there are a lot of cars coming in and out, that my son's hand is held, absolutely, for his safety.

Q. And was this after you'd been asked not to call or text Miss Stewart's phone?

A. I'm not sure, sir.

Q. Okay, and that was before Easter as well, correct?

A. I believe so, yes.

Q. So you were doing this from the parking lot at Burger King -

A. Doing what?

Q. Texting from the Burger King parking lot?

A. I don't believe so.  Did I - I don't believe I said that, sir.

Q. Where were you when you sent this text?

A. I don't remember, sir, sorry.

Q. Where were your children when you sent this text?

A. They were with Miss Stewart.

Q. And how do you know that?

A. Because I called on Friday to find out who was watching, I called - I texted Nicole -

Q. Nicole is Miss Stewart's daughter, correct?

A. Yes, on Friday, because I was, you know, wanted to check on the welfare of my children and I was not aware who was babysitting them because Mr. DiDonato was not supplying me with this information.  So I texted her daughter, Nicole, and Nicole said she was not watching the children, that Miss Stewart was watching them and so that is when I called Miss Stewart to check on the welfare of my children and that is when Miss Stewart, when I called, started yelling at me so I had to terminate the call.

Q. And how many times do you think you called Miss Stewart's cell phone Friday and Saturday?

A. Until, until I was able to speak with my children and have a conversation with them to make sure that they were okay.

Q. More than five times?

A. I do not believe it was five time, no.  I would say -

Q. How many times -

A. Well I can give you that answer, sir.  So I called my children on a Friday afternoon and when I called Miss Stewart's phone she started yelling at me so I terminated the call.

Q. And what did she yell at you?

A. So then I called -

Q. Ma'am, what did she yell at you?

A. Yes, she started yelling at me.

Q. What did she say?

A. Something about irrational something, don't ever call me, screaming, yelling so I terminated the call.

Q. Did you ever call her back?

A. So I called again, okay.

Q. How long did you wait to call?

A. I would say maybe a few minutes.  So I called again -

Q. You terminated the call because she was yelling at you?

A. Absolutely.

Q. Why did you call back?

A. Because I was concerned about the welfare of my children and I, I need -

Q. So you called the police?

A. I needed to speak with them.

Q. Ma'am, did you call the police?

A. No, I did not call the police.

Q. Did you call Job and Family Services?

A. No, I did not.

Q. Did you call Mr. DiDonato?

A. Not that I'm aware of, no.

Q. So that's a no, you didn't call Mr. DiDonato?

A. Okay, no.

Q. You just decided to call her back and demand to talk to your children, correct?

A. I called her back so I could speak with my children and find out the welfare of them, correct.

Q. How many more times did you call after that?

A. So I called her back a second time and my son, she must have given my - her phone to my son, Dan, and I had a conversation with Dan and as I was having a conversation with Dan about Miss Stewart's behavior, of yelling and whether my son had heard the yelling, she grabbed the phone from my son and started yelling at me again.

Q. What did she say to you?

A. She started yelling at me.

Q. No. What did she say?

A. It was very difficult to hear because she was screaming.

Q. So you don't know what she said?

A. It was, it was screaming and yelling in my ear.

Q. This isn't what you want to say, this is answering the questions.

A. It -

Q. What did she say?

A. I don't know.

Q. Thank you.

A. She was screaming and yelling.

Q. Okay, so you were concerned that your son had heard inappropriate behavior from the babysitter, correct?

A. I'm sorry, what was your question again?

Q. You were concerned your son had heard inappropriate language or yelling and screaming from the babysitter and you wanted to call back and find out, correct?

A. No, I don't believe I said that, sir.

Q. After this did you call again?

A. After what, sir?

Q. After, after she took the phone away did you call again?

A. After she took the phone away from my son, Daniel DiDonato?

Q. Yeah.

A. Did I call again? No. What I did so was -

Q. No, that, that's a no.

A. Okay, no, I didn't.

Tr. at p. 8-9; 12-13; 16-19.

**{¶10}** Bryon Holbrook then testified,

Q. Ok. I would like to draw your attention to, to April Eighteenth, which was a Friday a couple weeks ago.  Do you remember seeing Mrs. DiDonato on that day?

A. Yes.

Q. Ok. And where were you sir?

A. In the back yard.

Q. Ok, the back yard where?

A. At my house.

Q. Ok. And who was present there with you?

A. Michela Huth.

Q. And who else?

A. And Christina.

Q. Ok.  Do you remember Christine taking some phone calls or making phone calls that day?

A. Yes.

Q. Ok. What do you recall about that?

A. Well normally, as usual, I ask her, you know, how what's going on so she told me that Steve's acting up again and he won't tell me where the kids are so she was trying to allocate information and where her children were at were [sic] located.

Q. And did you - were you present when in fact she was making contact with someone?

A. Correct, yes I was.

Q. Ok. What did you observe at that time?

A. Well she was trying to find a phone number. She found a phone number in the email, this is what she told me at the time and tried to again ask I believe, somebody's daughter if they [sic] she was watching the children. And said that somebody else was watching the children, the mother or something like that, so then there was contact made at that point in time to talk to the children.

Q. And what did you observe when the phone call was made?

A. There was some screaming through the phone and then to my understanding the [sic] was hung up. Some [sic] she hung up, whoever she was speaking to hung up the phone.

Q. Ok, you don't know who she was speaking to, but you did observe a phone call -

A. Correct.

Q. You could actually hear the screaming through the phone?

A. Through the phone and -

Q. Was it on speaker phone?

A. No.

Q. Ok.

A. No.

Q. Alright.

A. We were only about five feet away from each other.

Q. You didn't hear, you didn't hear anything that was said, you just -

A. No.

Q. - heard the screaming?

A. No. I didn't hear anything, just the screaming and what was told by me was that she was screaming, not to call her, not to bother her, don't call her anymore, don't call her daughter.  This is what was [sic] Christina told me.

Q. And do you recall about what time of day that was by any chance?

A. Mid to late afternoon.

Q. Ok.

A. I'm, I'm trying to recall but I'm not a Hundred percent.

Q. Did you observe any additional phone calls?

A. There was some texting going on and then a phone call came in and then as I recall that was when she was speaking to her son, thinking it was some somebody else.  Again, I'm not sure who was on the other line.

Q. When you say she, you mean Christine DiDonato?

A. Christina, correct.

Q. Ok.  You, you, you saw her speaking to someone else?

A. Well she apparently thought it was the same person. Again, I don't remember the name or who she was speaking with.

Q. Did you hear any of that conversation at all?

A. Well the tone changed because she was now talking to her son -

Q. Ok.

A. - and this took about maybe ten or fifteen seconds and all of a sudden Christina said give my son the phone back.

Q. Then what do you recall?

A. Again some loud discussion.

Q. Ok.

A. That, you know, give the phone back to my son. Then again some more texting occurred after that transpired, that was over and done phone call, and then -

A. Q. What was Christina's demeanor, Christina DiDonato, you observe her talking on the phone, was she hollering too?

A. Well, I, I believe she was in distress cause she wanted to talk to her children and was unable to do that.

Q. Ok.

THE COURT: Well does that mean that she was loud or she wasn't loud? I think that was the question.

A. I'm not sure what -

Q. Ok, what I'm asking is, was Christine's voice elevated also?

A. Oh yes. Yes.

Q. Ok. So they were having a pretty healthy conversation then.

A. Yes.

Tr. at 117-120.

{¶11} Based upon the above, the trial court's findings of fact were based upon sufficient testimony.  While Appellant denies ever yelling at Appellee on the phone, Holbrook's testimony is contradictory as to the tone of Appellant's "elevated" voice. The weight to be given to the evidence and the credibility of the witnesses are issues for the trier of fact. *State v. Jamison,* 49 Ohio St.3d 182 (1990). The trier of fact "has the best opportunity to view the demeanor, attitude, and credibility of each witness, something that does not translate well on the written page." *Davis v. Flickinger,* 77 Ohio St.3d 415, 418, 1997–Ohio–260.   We find the trial court's assessment of credibility is not unsupported by the record taken as a whole.

{¶12} The May 1, 2014 Full Order of Protection entered by the Tuscarawas County Court of Common Pleas is affirmed.

By: Hoffman, P.J.

Gwin, J.  and

Wise, J. concur